UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SHANNON C. ADAMSON, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>PORT OF BELLINGHAM,<br><br>Defendant. | CASE NO. C14-1804 MJP<br><br>ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

The Court, having received and reviewed:

1. Port of Bellingham's Motion for Summary Judgment Pursuant to FRCP 56 Dismissing State Law Claims (Dkt. No. 54),

2. Plaintiffs' Opposition to the Defendant's Motion for Summary Judgment Pursuant to FRCP 56 Dismissing State Law Claims (Dkt. No. 56),

3. Port of Bellingham's Reply to Plaintiffs' Response to the Defendant's Motion for Summary Judgment Pursuant to FRCP 56 Dismissing State Law Claims (Dkt. No. 59),

1      4.  Plaintiffs' Surreply in Opposition to the Defendant's Motion for Summary Judgment

2          Pursuant to FRCP 56 Dismissing State Law Claims (Dkt. No. 64)

3  and all attached declarations and exhibits, makes the following ruling:

4      IT IS ORDERED that the motion for summary judgment is DENIED.

5      IT IS FURTHER ORDERED that Def's motion to strike portions of the declarations of

6  Plaintiffs' experts is DENIED.

## Background

8      The Court will spend little time on the details of the accident at issue here; those facts

9  have been thoroughly covered in previous orders.  In summary: Plaintiff, an Alaska ferry

10 employee, was injured while standing on the passenger loading ramp at Defendant's terminal and

11 attempting to lower it mechanically to the vessel.  The ramp was released before the cables

12 holding it were taut, resulting in the ramp dropping 10-12 feet and injuring Plaintiff.  The facts at

13 issue in this motion concern the history of the relationship between Defendant and Alaska

14 Marine Highway System ("AMHS") – the entity which operates ferries which use the Port and

15 employed Plaintiff – including a prior accident similar to the one at issue in this case.

16     The contractual relationship between the Port and AMHS dates back to 1989, when the

17 two parties signed a 20-year lease to allow AMHS to use a terminal in the Port facilities.  For the

18 first twelve years, line-handling and ramp-tending duties were handled by the Port; following

19 that period, those duties were handled by a combination of AMHS crewmembers and other

20 shipyard employees.

21 **2008 Incident**

22     On October 24, 2008, an incident nearly identical to Plaintiff's accident occurred; the

23 main difference being that, in this first incident, the ramp only dropped 1-2 feet (as opposed to

24

the 10-12 feet it dropped in Plaintiff's mishap).[1]  The Port terminal manager notified AMHS about the incident on the day it occurred and also advised them that incorrectly operating the Passenger Ramp could create a safety risk.  AMHS responded by acknowledging the seriousness of safety risk and requesting a set of operating instructions for the ramp.  In the aftermath, AMHS requested that the Port take over operation of the ramps (vehicle and passenger), but no agreement to that effect was ever reached and a combination of AMHS crewmembers and Puglia Engineering employees operated the ramp from that point forward.

The Port commissioned an engineering study of the damage to the ramp and on November 19, 2008, the Geiger Report was released – the report estimated the damages and the cost of repair and warned that an even more serious accident was possible if the situation recurred.  The author of the report predicted that the support cables could snap under certain conditions (Ex. 2, Waugh Depo 54:19 – 60:17), and recommended modifying the gangway controls so that the support pins could not be released if there was slack in the support cables.  (Ex. 3, Geiger Report, p. 2.)  A copy of the report was sent to the State of Alaska, Risk Management Division, but allegedly never sent to AMHS.  The Port did not adopt the report's recommendation, and the control panel was not modified until after Plaintiff's accident.

In 2009, the Port created a set of operating instructions for the Passenger Ramp which was posted by the ramp's control panel.  Defendant never developed a training protocol for ramp operation, did not supervise the operation of the ramp and had no system in place to determine who was qualified to operate the ramp.

---

[1] The hazard at issue here consists of the fact that, if an operator removes the "locking pins" on the Passenger Ramp while there is still slack in the suspension cables, the ramp will go into freefall until the cables are taut.  Plaintiff asserts (and Def does not contest) that a person standing on the Passenger Ramp operating the controls for the ramp cannot see if the cables are slack or not.

**2009 Lease**

When the lease was renegotiated in 2009, AMHS retained its status as a "priority user" of Defendant's Marine Facilities (which included the Passenger Ramp and the Vehicle/Passenger Ramp. (Dkt. No. 24-1, Ex. G, § 1.2.) "Priority use" meant that Defendant could enter into contracts with other ferry/vessel operators, but that those agreements would always be subordinate to AMHS's right to use the facilities. Plaintiff does not dispute Defendant's allegation that no other agreements were entered into and AMHS has been the only user of the premises. Since 2009, the Passenger Ramp has been operated by (1) the Bellingham Stevedore Co. ("BSC"), which operates under contract with Defendant; (2) AMHS employees; or (3) Puglia Engineering, which contracts directly with AMHS.

The lease imposes on Defendant a number of duties, including (1) keeping the premises in "good repair and tenantable condition" (Dkt. No. 24-1, Ex. G, § 4.1); (2) keeping the premises "in good and substantial repair and condition;" (Dkt. No. 24-1, Ex. G, § 4.1(a)); and (3) warranting that the premises "are tenantable" and paying to correct any violations of law cited by a regulatory agency. (Dkt. No. 24-1, Ex. G, § 4.9.)

Defendant asserts, without contradiction, that the Passenger Ramp was inspected annually by the Washington Department of Labor and Industries Division of Occupational Safety and Health and passed every year from September 2006 through September 2012. (Warter Decl. at ¶ 23 and Ex. F.) Plaintiff also does not contest Defendant's allegation that, in negotiating the new lease, AMHS requested no new terms relative to modification of the Passenger Ramp.

Two other sections of the lease are relevant to this litigation (and not mentioned in Defendant's briefing):

**Section 4.5 – Operations Manuals:** The Lessor will ensure Lessee has full, true and complete copies of the Car and Passenger Ramp operations manuals on or before the renewal date of this lease.

**Section 4.7 – Accident Hazards:** The Lessor will maintain the leased premises free of structural or mechanical hazards …

(Def. Ex. G.)

## Analysis

Defendant states that, regarding the remaining state claims of negligence, Plaintiff can prevail only on three possible theories. Plaintiff argues that there is a fourth which will be discussed at the end of this order.

**Defendant's proposed theories of negligence**

Owner liability

Defendant argues that the common law doctrine requiring a property owner to maintain a "safe workplace" (and embodied in the Washington Industrial Health and Safety Act -- RCW 49.17 *et seq.*;"WISHA") does not apply to the Port because the doctrine requires that it exercise "significant control" over the workplace in order for the duty to arise.

The seminal case in Washington is <u>Afoa v. Port of Seattle</u>, 176 Wn.2d 460 (2013), which upheld the right of an airport worker (not employed by the airport itself) to sue for injuries sustained due to unsafe conditions over which the airport had control. The operative language as regards owner liability states

> [I]t is settled law that jobsite owners have a specific duty to comply with WISHA regulations if they retain control over the *manner and instrumentalities* of work being done on the jobsite. Further, this duty extends to all workers on the jobsite that may be harmed by WISHA violations.
> * * *

> [T]he specific duty to prevent WISHA violations does not run only to the principal's employees, but to all workers on the work site who may be harmed by WISHA violations.

Id. at 472 (emphasis supplied).

Defendant makes much of the fact that it had no control over the AMHS employees, including Plaintiff. In the Court's opinion, this misses the point of Afoa and ignores both some critical WAC regulations and the intent of WISHA. The Afoa court found that WISHA applied to any jobsite owner who "retain[ed] control over the *manner and instrumentalities* of work being done on the jobsite." The Passenger Ramp is an "instrumentality" of the work being done on the Port worksite, and several factors point to the control retained by Defendant in this case.

In the 2009 lease, Defendant warranted

> **Section 4.7 – Accident Hazards:** The Lessor will maintain the leased premises free of structural or mechanical hazards …

There is a colorable argument that the Passenger Ramp constituted a "mechanical hazard" and one of which Defendant (by virtue of the 2008 incident and the Geiger Report) was well aware. If it was a mechanical hazard, Defendant retained control over it by virtue of its contractual commitment to keep its premises free of such dangers.

Furthermore, the WACs regarding safety standards for "waterfront related operations" (promulgated pursuant to WISHA), state

> Only those employees determined by the employer to be competent by reason of training or experience, who understand the signs, notices, and operating instructions and are familiar with the signal code in use shall be permitted to operate a crane, winch or other power-operated cargo handling apparatus.

WAC § 296-56-60006(1)(a).

And also

> (1) An accident prevention program, which provides equitable management-employee participation, shall be established in all establishments, industrial plants and operations.
> (2) It shall be the responsibility of the employer to initiate and maintain the accident prevention program necessary to comply with this section.

WAC § 296-56-60009.

It remains an open question whether the Passenger Ramp constituted a "cargo handling apparatus" for purposes of these regulations – the parties did not brief the question. There is no question that the Port did not have in place a program to qualify persons to operate the ramp. Nor is there is a question that Def had not "initiate[d] and maintain[ed] [an] accident prevention program" at the time of Plaintiff's accident.

The Afoa court which held the Port of Seattle potentially liable for injuries to an employee who did not work for them ("An employer who… creates a workplace safety hazard may be liable under OSHA even if the injured employees work only for a different employer;" 176 Wn.2d at 472) was doing so under the federal "multi-employer workplace rule." (See Martinez Melgoza & Assocs. V. Dept. of Labor & Indus., 125 Wn.App. 843, 848-49 (2005).) Defendant attempts to argue that the Port was not a "multi-employer worksite," but the Court is not persuaded. In addition to the Port's own employees, the briefing mentions workers employed by AMHS, BSC and Puglia Engineering. Defendant has failed to cite to any case law under which that kind of environment would not qualify as a "multi-employer worksite."

Nor does the fact that Defendant could not actually supervise the work of the AMHS employees alter the reality that, in the area of the safe operation of Passenger Ramp, the Port had the right (and the obligation) to maintain the device in safe condition and ensure that whoever operated it was qualified to do so in a safe manner. This satisfies the threshold requirements for the imposition of owner liability.

1    Defendant attempts to sidestep this obligation by pointing fingers at AMHS – pointing
2    out, among other things, that the agency never requested a modification of the Passenger Ramp
3    in the renegotiated lease, and that they never requested a training program or protocol from the
4    Port.  This does not relieve the Port of their affirmative responsibility -- the duty is the Port's to
5    fulfill and the fact that the users of the premises did not insist that they do so does not relieve
6    Defendant of the obligation.

7    The only way in which Defendant did attempt to fulfill this responsibility was to generate
8    – at the request of AMHS – a set of operating instructions for the gangway controls.  (Plaintiff.
9    Ex. 8.)  But, in addition to containing no warning of the danger of ramp collapse, the instructions
10   were (according to Plaintiff's expert) "poorly written," "grossly deficient [and] misleading."
11   (*See* Schaefer Decl. ¶ 11.)  The Court finds that there is an issue of material fact whether the
12   instructions were sufficient to discharge Defendant's duty; even the Port's terminal manager
13   acknowledged in an email Defendant's duty to provide AMHS, not with a set of operating
14   instructions, but with full operation manuals for the equipment.  (Plaintiff. Ex. 18.[2])

15   The Court finds that Defendant is not entitled to summary judgment of dismissal on an
16   "owner liability" theory of negligence.

17   Premises liability

18   Defendant's potential liability under this theory turns on whether Plaintiff can properly be
19   considered a "business invitee."  If she was, the Port (as owner of the premises onto which she
20   was invited) owed her a duty of reasonable care to inspect for dangerous conditions and make

---

[2] The terminal manager asserts in the email that this was done in 1988, while admitting that he is "sure that those would not be adequate for a person in the field to read and understand when the ramp needs to be adjusted now."

whatever repairs and warnings or install whatever safeguards were necessary to protect the invitee. <u>Tincani v. Inland Empire Zoological Soc.</u>, 124 Wn.2d 121, 139 (1994).

Defendant disputes Plaintiff's status as a "business invitee" on the basis that, if "exclusive control" of the premises has passed to the tenant, the landlord no longer owes a duty to licensees or invitees. <u>Regan v. City of Seattle</u>, 76 Wn.2d 501, 504 (1969). The Port makes two related arguments in this regard:

(1) That AMHS's "priority use" privileges, coupled with the fact that the Port never issued "subordinate" leases to any other user, is the equivalent of "exclusive control."

(2) That the fact that, when AMHS was using the terminal, they had absolute right to access of that part of the facility was sufficiently "exclusive use" to relieve the Port of any duty to business invitees.

The Court is not convinced by Defendant's position. The power to issue subordinate leases was entirely within Defendant's discretion. The fact that it chose not to exercise that discretion does not render AMHS the "exclusive user" of their facilities; i.e., "only user" does not equal "exclusive user" under these circumstances. Similarly, the fact that the lease gave AMHS "priority use" of the facility when its vessels were docked does not equate to "exclusive use" – presumably any vessel which docked at the terminal would have had sole access to the Passenger Ramp during the period it was moored. Defendant certainly presents no evidence that any other vessel could have physically connected with the ramp when another vessel was moored there.

Plaintiff again cites to <u>Afoa</u> in regard to this issue, arguing that her position is analogous to that of Afoa (whom the Washington court found to be a business invitee). The factors cited by the <u>Afoa</u> court:

(1) That Plaintiff was on the Port's premises for reasons related to business dealings with the Port of Seattle, and

ORDER ON DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT- 9

     (2) That there was a "mutuality of interest" between the Port, Plaintiff and Plaintiff's employer (i.e., that the Port had an interest in Plaintiff doing his job because it served the Port's business purpose and Plaintiff had an interest in helping the Port's business because it meant continued employment)

(176 Wn.2d at 469) are applicable to Ms. Adamson and her employer, as well as to the Port of Bellingham.

    Defendant attempts to distinguish <u>Afoa</u> in terms of its "premises liability" analysis because, unlike Afoa's employer, Plaintiff's employer is a *tenant* of the Port. It argues that "the rules of premises liability are inapplicable to a landlord who has conveyed exclusive possession of the leased premises to a tenant," (Mtn at p. 18, *citing* <u>Sunde v. Tollett</u>, 2 Wn.2d 640, 642 (1970)), but this position runs afoul of the same problems as their "exclusive control" argument above. The Court does not find that, as a matter of law, the Port has established that the "priority use" rights granted by their lease with AMHS are the legal equivalent of "exclusive control" or "exclusive possession."

    Having found that Defendant has not shed its duties under premises liability, there also remains a disputed issue of material whether the Port's providing the Geiger Report to the Alaska State Office of Risk Management (and not to AMHS) violated their duty to provide adequate warnings of hazardous conditions to its business invitees. Defendant does not dispute that Risk Management did not inform AMHS of the contents of the report. Nor does the fact that AMHS was aware of the 2008 incident overcome the potential liability associated with their not being told exactly <u>how</u> serious the mechanical defect was. Plaintiff goes to some lengths to demonstrate the personnel from both sides (the Port and AMHS) were largely unaware of the

Geiger Report's conclusion that, under the right circumstances, the ramp could collapse entirely. (Plaintiff Response at 6-7.)[3]

The Court finds that Defendant has not established a right to dismissal of the negligence claim against it on a premises liability theory.

Landlord liability

In general terms, the duty of a landlord to the employees of its tenant does not extend beyond the duty to the tenant (Baker v. Moeller, 52 Wn. 605, 608 (1909)) and the landlord is liable to its tenant only for known latent defects which are not likely to be discovered by the tenant. (Charlton v. Day Island Marina, Inc., 46 Wn.App. 784, 788 (1987); Aspon v. Loomis, 62 Wn.App. 818, 826-27 (1991).) Defendant argues that it warned AMHS of the hazard in 2008 (right after the first accident), and then further cautioned them by sending a copy of the Geiger Report.

There are two disputed areas of material fact that preclude summary judgment on this basis. The first is: was the information contained in the emails following the 2008 incident (*see* Defendant. Exs. A and C) adequate to apprise AMHS of the nature of the danger posed by improper operation of the Passenger Ramp? Viewing all evidence in the light most favorable to the non-moving party, there is a colorable argument that what happened in Plaintiff's accident was of such a greater magnitude than the 2008 event that simply issuing an admonition intended to prevent a repeat of the 2008 mishap was inadequate warning for what happened in 2012.

The second has been discussed *supra*: whether providing the Geiger Report (which did warn of the potential for a more serious event) to the Alaska State Office of Risk Management

---

[3] Including a deposition excerpt from the head of the Port's Safety Committee wherein she asserts that there was no need to warn AMHS of the potential collapse danger of the ramp. (Ex. 6, Monahan Depo., 21:4-21.)

constituted adequate warning to AMHS. Again, the parties disagree on the impact and significance of this fact; the Court finds it is both disputed and material.

Plaintiff also argues that landlords are responsible under Washington law for hazards in "common areas" in the leased premises that result in harm to others. McCutcheon v. United Homes Corp., 79 Wn.2d 443, 445 (1971). Plaintiff quotes Degel v. Majestic Mobile Manor, Inc., 129 Wn.2d 43, 53 (1996) for the standard of care expected of landlords:

> [A tenant] "enters upon an implied representation or assurance that the land has been prepared and made ready and safe for his reception. He is therefore entitled to expect that the possessor will exercise reasonable care to make the land safe for his entry or for his use for purposes of the invitation. He is entitled to expect… such repair, safeguards or warning as may be reasonably necessary for his protection under the circumstances."

(*citing* Jarr v. Seeco Constr'n Co., 35 Wn.App. 324, 326 (1983) and RESTATEMENT (SECOND) OF TORTS, § 343.cmt b.)

Defendant attacks the assertion that the Passenger Ramp was a "common area," citing case law that the term refers to parts of the leased premises expressly or impliedly reserved for the use of all tenants (Anderson v. Reeder, 42 Wn.2d 45, 48 (1953)) and is usually thought to include "approaches, common passageways, stairways and other areas to be used in common by the owner and the tenants." McCutcheon, 79 Wn.2d at 445. The Port again makes the argument that AMHS was the only tenant; that being the case, all that is needed to make the Passenger Ramp a "common area" was that both AMHS and the Port had access to it. This dual right to access is undoubtedly the case, as even Defendant admits that it had the right to access the gangway for inspection purposes.

Additionally, it is clear from the evidence that employees of BSC and Puglia Engineering (who contracted with the landlord and the tenant, respectively) had access to the ramp. Furthermore, had the Port issued "subordinate leases" for use of the terminal, there is little doubt

that the subordinate lessees would have had the right to use the Passenger Ramp (subject to AMHS's "priority use"). The Court finds that it is at least a disputed question of material fact (mixed with disputed issues of law) whether the gangway was a common area.

The Port also argues, in regards to its duties as a landlord, that the duty to repair does not equal the duty to upgrade (*citing* Prudential Ins. Co. of America v. L.A. Mart, 68 F.3d 370 (9th Cir. 1995); i.e., it was obligated to fix anything that was wrong with the ramp *in its current condition,* but not to improve it to the point where it was no longer dangerous. The Court again refers to the lease provision requiring Defendant to maintain the premises free of "mechanical hazards" in finding that Defendant does not prevail on this argument.

The Court finds that (viewing all the evidence in the light most favorable to Plaintiff) the Port is not entitled to summary judgment of dismissal here, either.

**Plaintiff's "fourth theory":** Direct negligence for deficient ramp instructions

Plaintiff argues that there is a fourth basis for recovery which Defendant has not addressed – the Port's "direct negligence in producing misleading and grossly deficient ramp instructions." (Response at 13.)

Plaintiff has failed to articulate a new, independent theory of liability: the Port has a duty of care to Plaintiff as a landowner, a business invitor or a landlord, and Plaintiff cites no cases involving a duty of care independent of any of these roles. If the instructions were negligently created and tortiously deficient, Defendant's liability for that is under one of the previous three theories or not at all.

**Motion to Strike**

Defendant moves to strike portions of the declarations of all of Plaintiffs' experts (Reply at 6-7, fn.19). Defendant expended very little effort in identifying the specifics of why the

experts' statements should be stricken, outside of generically labeling them "impermissible legal conclusions." The Court will expend a similar amount of effort in denying the motion to strike. The decisive issues in this motion were legal issues and the Court reaches those legal issues without reference to the opinions of Plaintiffs' experts. The motion to strike is DENIED.

**Conclusion**

Defendant has failed to establish, as a matter of law, that it is entitled to summary judgment of dismissal of the state law negligence claims remaining against it; Defendant's motion is therefore DENIED. Defendant's motion to strike the statements of Plaintiffs' experts is also DENIED.

The clerk is ordered to provide copies of this order to all counsel.

Dated January 29, 2016.

_____
Marsha J. Pechman
United States District Judge